# Syllabus

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

PEOPLE v WALKER

Docket No. 155198. Argued on application for leave to appeal January 24, 2019. Decided July 11, 2019.

Harold L. Walker was convicted following a jury trial in the Wayne Circuit Court of being a felon in possession of a firearm, MCL 750.224f; carrying a concealed weapon, MCL 750.227; and possession of a firearm when committing or attempting to commit a felony, MCL 750.227b(1). In August 2014, defendant was on parole from a prior felony conviction; conditions of defendant's parole prohibited him from possessing a weapon and from being around alcohol. On August 5, 2014, police officers saw a group of four individuals drinking beer and listening to loud music near a vehicle in Detroit. As the officers approached the group, defendant walked toward the nearby house, holding something in the front pocket of his pants that appeared to be heavy. When he reached the front porch of the house, defendant threw something into a bush beside the porch; the police arrested defendant after they recovered a loaded revolver from the bush. Defendant asserted through his own testimony as well as that of a corroborating witness that the witness had earlier hidden the gun in the bushes and that defendant had tossed a beer bottle into the bush, not a gun. After the jury was picked, the court noted that Juror No. 8 was late, had not called in, and that "bad things might happen to that person." When the juror arrived, the juror was seated in view of the other jurors in the area reserved for in-custody criminal defendants before being dismissed from the jury. Approximately 75 minutes after it began deliberating, the jury notified the trial court that it was deadlocked. The trial court gave a supplemental, ad-lib instruction to the jury (instead of the M Crim JI 3.12 deadlocked-jury instruction), sent the jury members to lunch, and twice instructed the jury to let the court know if any jurors were failing to follow the instructions or failing to participate in deliberations. The jury found defendant guilty of all charges approximately 90 minutes after resuming deliberations following lunch. Defendant appealed in the Court of Appeals, arguing that he was entitled to a new trial because the trial court's deadlocked-jury instruction was impermissibly coercive. In an unpublished per curiam opinion issued December 1, 2016 (Docket No. 327063), the Court of Appeals, FORT HOOD, P.J., and O'BRIEN, J. (GLEICHER, J., dissenting), affirmed, reasoning that, in context, the instruction did not coerce a verdict. Defendant sought leave to appeal, and the Supreme Court ordered and heard oral argument on whether to grant the application or take other action. 501 Mich 1088 (2018).

In an opinion by Justice CAVANAGH, joined by Chief Justice MCCORMACK, and Justices VIVIANO, BERNSTEIN, and CLEMENT, the Supreme Court, in lieu of granting leave to appeal, *held*:

M Crim JI 3.12 provides model jury instructions that may be used when a jury appears to be deadlocked. Although every deviation from M Crim JI 3.12 does not constitute error requiring reversal, the trial court's ad-lib supplemental instruction omitted nearly every safeguard provided by the model instruction and crossed the line from appropriately encouraging deliberation to being unduly coercive: the instruction (1) failed to offer constructive advice to encourage further deliberation, (2) omitted important safeguards of jurors' honest convictions, and (3) included coercive language. In addition, the instruction was delivered in a coercive atmosphere given the tenor of the proceedings. Taken together, these circumstances impermissibly coerced jurors to surrender their honestly held beliefs for the sake of reaching a verdict. The Court of Appeals judgment was reversed and the case remanded for a new trial before a different judge.

1. When a jury indicates that it cannot reach a unanimous verdict, a trial court may give a supplemental instruction to encourage the jury to continue deliberating. If a jury indicates that it is deadlocked after deliberating too short a period for thoughtful deliberation, the trial court may simply instruct the jury to continue their deliberations. The goal of an instruction to a jury that cannot reach a verdict is to encourage deliberation without coercing a verdict and to offer constructive guidance on how to deliberate. In that regard, giving an honest-conviction reminder tempers the trial court's simultaneous emphasis on reaching a unanimous agreement. Encouraging jurors to single out jurors who are not participating when there is no indication that a juror has refused to deliberate can constitute undue pressure, threats, or embarrassing assertions that would tend to force a decision or cause a juror to abandon his or her conscientious dissent and defer to the majority. M Crim JI 3.12, the model deadlocked-jury instruction, balances the goal of encouraging deliberation without coercing a verdict, but that is not the only instruction that may be given to a deadlocked jury. In other words, every deviation from the model instruction does not constitute error requiring reversal. The relevant inquiry—considering the factual context in which the instruction was given on a case-by-case basis—is whether the instruction given could cause a juror to abandon his or her conscientious dissent and defer to the majority solely for the sake of reaching agreement.

2. Taken together, the trial court's ad-lib supplemental instruction to the jury was unduly coercive because (1) the instruction lacked constructive guidance to the jury on how to continue deliberating and break through the impasse and encouraged an antagonistic relationship among the jurors when it prompted them to single out any juror who was refusing to deliberate when there was no indication that a juror had refused to deliberate; (2) the instruction failed to remind the jurors that they should not give up their honestly held beliefs for the sake of reaching an agreement; (3) rather than simply instructing the jury to continue its deliberations, the instruction contained coercive language that telegraphed to jurors that failure to reach a verdict was not an option and suggested that jurors single out other jurors for refusing to deliberate when there was no indication that a juror had refused to deliberate; and (4) the trial court's conduct during the trial telegraphed that the court would not tolerate a hung jury. In addition, the quick turnaround in arriving at a guilty verdict after the court's supplemental instruction suggested that the verdict was coerced. Therefore, the instruction given not only omitted nearly every safeguard contained in M Crim JI 3.12, but it was administered in a coercive atmosphere. The instruction affected defendant's substantial rights and the fairness, integrity, and public reputation of the judicial proceedings by affecting the jury's verdict.

3. The case was assigned to a different judge on remand because, given the trial court's interactions with defendant during sentencing, the original trial judge would have substantial difficulty setting aside her previously expressed views. Reassignment was necessary to preserve the appearance of justice given the court's hostility and bias toward defendant, and any waste or duplication was not out of proportion to the gain in preserving the appearance of fairness.

Reversed and remanded for a new trial.

Justice ZAHRA, joined by Justice MARKMAN, dissenting, disagreed with the majority's conclusion that the trial court's supplemental instructions were unduly coercive. The majority's holding did not reflect the traditional notion of jury coercion. While the majority acknowledged that it would have been permissible for the trial court to instruct the jury to continue its deliberations after it was deadlocked, the two statements relied on by the majority to support its coercion conclusion ignored the practical realities the trial court faced when the jury indicated it was deadlocked after deliberating for only 75 minutes. The trial court was uniquely situated to determine whether the jury needed a break or was at a true impasse, and the court reasonably concluded that that the jury had not engaged in a meaningful deliberative process that led to an impasse. Thus, the trial court's statements were directed at the jury's failure to engage in full-fledged deliberation, not its failure to reach a verdict. No reasonable juror would have interpreted the court's statements as compelling a verdict by force or intimidation. Instead, the trial court appropriately gave the jurors a lunch break to help them engage in the deliberative process when they returned. The trial court's instruction that the jury should let the court know if any juror was failing to follow instructions or refusing to participate in the process did not amount to undue pressure, threats, or embarrassing assertions that tended to force a decision or make a juror abandon his or her conscientious dissent and defer to the majority. Significantly, the trial court did not appeal to civic duty or assert that failure to reach a verdict constituted a failure of purpose; the only requirement imposed by the trial court was that the jurors go to lunch, which did not coerce one or more jurors to vote to convict. The trial court's failure to remind the jurors that they should maintain their honest convictions after the jury suggested it might be at an impasse was not dispositive of whether the instructions were coercive; the instruction emphasized that the jurors had not deliberated a sufficient amount of time rather than emphasizing the need to reach a unanimous verdict, making the honest-conviction reminder unnecessary. Because the jury had been given a written copy of the court's final instructions that included honest-conviction reminders, the trial court's failure to reiterate that instruction did not transform the instruction to deliberate after returning from lunch into an unduly coercive one. The trial court did not have to provide guidance on how to continue deliberating and how to break through the impasse because it correctly decided that the jury was not truly deadlocked. While the correct inquiry was whether the supplemental instruction was coercive, the majority's holding promoted a per se rule that any departure from M Crim JI 3.12 would necessarily result in the instruction being unduly coercive. In addition, the majority incorrectly relied on portions of the lower court record that were unrelated to whether the supplemental instruction was coercive, and those portions did not support its conclusion that the instruction was coercive. The majority's conclusion demonstrated that it was disconnected from the trial-court process because the court's statements to Juror No. 8, which the majority relied on to support its ultimate conclusion, exhibited the trial court's interest in running a timely and efficient, no-nonsense courtroom; the statements did not signal to the remaining jurors that they should ignore the jury instructions and, instead, follow the court's implicit views of the case. Even if the trial court erred by giving the supplemental instruction, reversal was not required

because defendant failed to demonstrate that the instruction affected the fairness, integrity, and public reputation of the judicial proceedings. Justice ZAHRA would have affirmed the judgment of the Court of Appeals.

©2019 State of Michigan

# OPINION

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

FILED July 11, 2019

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v                                                                          No. 155198

HAROLD LAMONT WALKER,

Defendant-Appellant.

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

At issue in this case is whether the trial court committed error requiring reversal when it gave an ad-lib deadlocked-jury instruction. We conclude that it did. The instruction given by the trial court lacked constructive advice to encourage further deliberation, omitted important safeguards of jurors' honest convictions, included coercive language, and was delivered in a coercive atmosphere. We hold that the instruction crossed the line from appropriately encouraging deliberation and candid consideration to impermissibly coercing jurors to surrender their honestly held beliefs for the sake of

reaching a verdict. The error was plain, affected defendant's substantial rights, and affected the fairness, integrity, and public reputation of the judicial proceeding. Accordingly, we reverse the judgment of the Court of Appeals and remand the case to the Wayne Circuit Court for a new trial. Additionally, in light of the trial court's conduct during defendant's sentencing, we direct that defendant be retried before a different judge. Because we hold that defendant is entitled to a new trial, we do not address his remaining issues.

## I. FACTS AND PROCEDURAL HISTORY

On August 8, 2014, defendant, Harold L. Walker, was charged with being a felon in possession of a firearm (felon-in-possession) under MCL 750.224f; carrying a concealed weapon (CCW) under MCL 750.227; and possession of a firearm when committing or attempting to commit a felony (felony-firearm) under MCL 750.227b(1). At trial, multiple police officers testified that on August 5, 2014, while on routine patrol in a high-crime residential area of Detroit, they saw four people standing and drinking beer on a sidewalk outside a home, near a vehicle playing loud music. As the police officers approached the group, defendant quickly walked away, holding something that appeared to be heavy in a front pocket of his pants. When he reached the home's porch, defendant pulled from his pocket what looked to the officers like a large-frame revolver and threw it into a bush beside the porch. The police recovered a loaded revolver from the bush and arrested defendant. As a condition of his parole from a prior felony conviction, defendant was not allowed to possess a weapon.

2

Defendant offered an alternative explanation for the revolver being in the bush. Darryl Jevon Williams, Jr., lived in the neighborhood and was with defendant on the night in question. Williams testified that he knew defendant was on parole and that defendant could not be around guns, so Williams hid *his* gun in the bush before defendant arrived. Both Williams and defendant testified that it was a Budweiser beer bottle that defendant had tossed into the bush and that defendant had tossed the bottle because he could not be around alcohol while on parole.

At his trial, defendant presented one witness (Williams) and testified on his own behalf. The jury began deliberating at 11:19 a.m. At 12:36 p.m., the trial court announced to counsel that the jury "sent out a note saying that they can't reach a decision and they're deadlocked." The court stated that, later, if there was another note from the jury, it would "read the *Allen*[1] Instruction, but at this point after one hour of deliberations I don't think, you know, that they've even made a [sic] effort."

When the jury reentered the courtroom, the trial court stated that it had received two notes: one requesting to see the gun (which the trial court noted had already been accomplished), and one stating, "We are hung and I don't believe there will be and [sic] agreement with more time." The trial court then delivered the following instruction:

> Well, *that's not the way this works.* Your [sic] all heard a full day of testimony, and you deliberated for what a [sic] hour and fifteen minutes, and now you just give up. *That's not the way it works*, I'm sending you all to lunch, maybe what you need is some time a part [sic] and some nourishment, other than candy, to help you all, you know, have clear heads and review the evidence that you heard.

---

[1] *Allen v United States*, 164 US 492; 17 S Ct 154; 41 L Ed 528 (1896).

*Now, if there's someone among you who's failing to follow the instructions or there's someone who's refusing to participate in the process, you can send us a note and let us know that and we can address that*, but at this point I'm not inclined to end your deliberations at this point because you had a full day of testimony and you've only been at this, discussing it, for one hour.

So I'm going to send you to lunch, maybe sometime [sic] apart will help you all to think about things, and then you'll come back in one hour and resume your deliberations. If you have any questions, if there is anything that you don't understand or need clarification on send a note. *And again, if there's one among you or two among you, three among you who are refusing to follow the instructions or participate in the process you can let us know that, too.* [Emphasis added.]

The jury returned a verdict of guilty on all counts at 3:07 p.m., approximately 1½ hours after returning from lunch. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to concurrent prison terms of 46 months to 75 years for felon-in-possession and CCW, both of which were to be served consecutively to the mandatory 10-year sentence for third-offense felony-firearm.[2]

Defendant filed a claim of appeal in the Court of Appeals arguing, among other assertions of error, that the trial court's deadlocked-jury instruction was impermissibly coercive. In an unpublished opinion, a divided Court of Appeals panel affirmed defendant's convictions. *People v Walker*, unpublished per curiam opinion of the Court of Appeals, issued December 1, 2016 (Docket No. 327063), p 12. In relevant part, the Court of Appeals majority reasoned that the trial court's jury instruction "stressed to the jury the

---

[2] The Court of Appeals remanded to the trial court the ministerial issue of correcting defendant's judgment of sentence because the judgment should have provided that his felony-firearm sentence is to be served consecutively to his felon-in-possession sentence only, and not consecutively to his CCW sentence. *People v Walker*, unpublished per curiam opinion of the Court of Appeals, issued December 1, 2016 (Docket No. 327063), p 6.

4

importance of engaging in a full-fledged deliberation" and held that, in context, the instruction did not coerce a verdict. *Id*. at 4. The dissenting judge concluded that the instruction was impermissibly coercive and that defendant was entitled to a new trial. *Id*. (GLEICHER, J., dissenting) at 1, 5.

Defendant sought leave to appeal in this Court. Oral argument was scheduled on whether to grant the application or to take other action, see MCR 7.305(H)(1), on issues including: "whether . . . defendant is entitled to a new trial based on the trial judge's comments to the jury in lieu of the standard 'deadlocked jury' instruction, M Crim JI 3.12." *People v Walker*, 501 Mich 1088 (2018).

## II. STANDARD OF REVIEW

"We review de novo claims of instructional error." *People v Kowalski*, 489 Mich 488, 501; 803 NW2d 200 (2011). Because defendant failed to object to the instruction,[3] we apply the plain-error rule, which requires that (1) error must have occurred, (2) the error was plain, (3) the plain error affected substantial rights, and (4) the error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity or public reputation of judicial proceedings. *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018); *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). An error is plain if it is "clear or obvious." *Carines*, 460 Mich at 763. An error has affected a defendant's substantial rights when there is "a showing of prejudice, i.e., that the error

---

[3] The prosecution argues for the first time in its supplemental brief to this Court that defendant waived any challenge to the instruction by approving of the instruction before it was given. The prosecution abandoned this theory. *People v McGraw*, 484 Mich 120, 131 n 36; 771 NW2d 655 (2009).

affected the outcome of the lower court proceedings." *Id*. A defendant bears the burden of persuasion with respect to prejudice. *Id*.

## III. ANALYSIS

When a jury indicates it cannot reach a unanimous verdict, a trial court may give a supplemental instruction—commonly known as an *Allen*[4] charge—to encourage the jury to continue deliberating. *People v Sullivan*, 392 Mich 324, 329; 220 NW2d 441 (1974). The goal of such an instruction is to encourage further deliberation without coercing a verdict. *People v Hardin*, 421 Mich 296, 314; 365 NW2d 101 (1984). See *Allen v United States*, 164 US 492, 501; 17 S Ct 154; 41 L Ed 528 (1896) ("While undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by a comparison of views . . . ."). "If the charge has the effect of forcing a juror to surrender an honest conviction, it is coercive and constitutes reversible error." *Sullivan*, 392 Mich at 334 (quotation marks and citation omitted).

In *Sullivan*, this Court adopted a standard deadlocked-jury instruction that has since been incorporated into our model jury instructions.[5] *Id*. at 341; M Crim JI 3.12. Although

---

[4] *Allen*, 164 US 492.

[5] M Crim JI 3.12 provides the following:

> (1) You have returned from deliberations, indicating that you believe you cannot reach a verdict. I am going to ask you to please return to the jury room and resume your deliberations in the hope that after further discussion you will be able to reach a verdict. As you deliberate, please keep in mind the guidelines I gave you earlier.

6

the model instruction is an example of an instruction that strikes the correct balance, it is not the only instruction that may properly be given. The relevant question is whether "the instruction given [could] cause a juror to abandon his [or her] conscientious dissent and defer to the majority solely for the sake of reaching agreement[.]" *Hardin*, 421 Mich at 314. The inquiry must consider the factual context in which the instruction was given and is conducted on a case-by-case basis. *Sullivan*, 392 Mich at 332-334.

The disputed factual issue in this case was relatively straightforward—whether defendant took a gun from his pocket and threw it into a bush where it was recovered by the police—and the jurors deliberated for only about an hour and fifteen minutes before

---

(2) Remember, it is your duty to consult with your fellow jurors and try to reach agreement, if you can do so without violating your own judgment. To return a verdict, you must all agree, and the verdict must represent the judgment of each of you.

(3) As you deliberate, you should carefully and seriously consider the views of your fellow jurors. Talk things over in a spirit of fairness and frankness.

(4) Naturally, there will be differences of opinion. You should each not only express your opinion but also give the facts and the reasons on which you base it. By reasoning the matter out, jurors can often reach agreement.

(5) If you think it would be helpful, you may submit to the bailiff a written list of the issues that are dividing or confusing you. It will then be submitted to me. I will attempt to clarify or amplify the instructions in order to assist you in your further deliberations.

(6) When you continue your deliberations, do not hesitate to rethink your own views and change your opinion if you decide it was wrong.

(7) However, none of you should give up your honest beliefs about the weight or effect of the evidence only because of what your fellow jurors think or only for the sake of reaching agreement.

7

sending a note stating that they could not reach an agreement. Assuming that this was too short a period for thoughtful deliberation, a simple instruction to the jury to "continue your deliberations" would certainly have been permissible. See *People v France*, 436 Mich 138, 165-166; 461 NW2d 621 (1990). See also *Lowenfield v Phelps*, 484 US 231, 238; 108 S Ct 546; 98 L Ed 2d 568 (1988) ("Surely if the jury had returned from its deliberations after only one hour and informed the court that it had failed to achieve unanimity . . . , the court would incontestably have had the authority to insist that they deliberate further."). Although the trial court seems to have recognized that an *Allen* charge was not yet required, it nevertheless ventured into *Allen*-territory with its ad-lib instruction. For the reasons below, we conclude the instruction given in this case crossed the line from appropriately encouraging deliberation to being unduly coercive.

First, the trial court failed to provide the jurors guidance on how to continue deliberating and how to try to break through the impasse. For example, M Crim JI 3.12(3) advises jurors that they should "carefully and seriously consider the views of . . . fellow jurors" and "[t]alk things over in a spirit of fairness and frankness." M Crim JI 3.12(4) addresses how jurors might meaningfully engage with one another rather than just stating their positions: "You should each not only express your opinion but also give the facts and the reasons on which you base it." In this case, the only guidance provided by the trial court was that the jurors needed to get "clear heads." Significantly, instead of encouraging the jurors to consider their fellow jurors' views, the trial court encouraged an antagonistic relationship among the jurors by prompting them, without elaborating on what it meant, to report anyone who was "refusing to participate in the process."

8

Second, the trial court failed to remind the jurors that they should not give up their honestly held beliefs for the sake of reaching an agreement.  A review of our past decisions bears out the importance of this honest-conviction reminder, which tempers the court's simultaneous emphasis on reaching a unanimous agreement.  In *People v Engle*, 118 Mich 287, 291-292; 76 NW 502 (1898), we ordered a new trial because after the jury indicated that it was unable to agree on a verdict, the trial court's deadlocked-jury instruction failed to state "that the verdict to which [the jury] agreed should be and must be each individual juror's own verdict, the result of his own convictions, and not a mere acquiescence in the conclusion of his fellows[.]"  *Id*.  In contrast, this Court has upheld verdicts in cases in which the instruction given included the honest-conviction reminder.  See, e.g., *People v Coulon*, 151 Mich 200, 203-204; 114 NW 1013 (1908) (holding that the instruction in that case was distinguishable from the instruction in *Engle*, and therefore not erroneous, because the trial court had instructed that "no juror should yield his well-grounded convictions or violate his oath; that if upon further consideration a juror cannot conscientiously yield, of course he ought not to do so").  See also *People v Rouse*, 477 Mich 1063 (2007) (reversing the Court of Appeals for the reasons stated in the Court of Appeals dissenting opinion, *People v Rouse*, 272 Mich App 665, 675-677; 728 NW2d 874 (2006) (JANSEN, J., dissenting), which noted that the trial court had read the standard instruction, including the honest-conviction reminder, and had "emphasized that no juror should change his or her honest beliefs simply for the sake of reaching a verdict"); *Hardin*,

9

421 Mich at 318 (holding that supplemental instructions were not unduly coercive because

an honest-conviction reminder was given after the challenged instructions).[6]

Third, the trial court's instruction included language that was unduly coercive. The

jury's note was received approximately one hour and fifteen minutes after the jury began

deliberating.[7] Before sending the note, the jury had obviously discussed the case, asked to

see the gun, and at least one juror harbored doubt regarding defendant's guilt. Because the

jury had already indicated that it was deadlocked, at that point, there was "a greater

---

[6] We disagree with the dissent that the trial court's failure to include an honest-conviction instruction in its ad-lib instruction does not render the ad-lib instruction unduly coercive because the jury was given an honest-conviction instruction with the final instructions and a written copy of these instructions was in the jury room during deliberations. The ad-lib instruction was the last instruction given, and its influence was therefore unmitigated. Cf. *Hardin*, 421 Mich at 318 (noting that "any unwarranted inference by the jury" from the trial court's statements was mitigated by those statements having preceded the trial court's instruction that no juror should surrender his or her honest convictions for the purpose of returning a verdict). See also *People v Pollick*, 448 Mich 376, 385; 531 NW2d 159 (1995) ("It requires no special insight to see that there is a greater coercive potential when an instruction is given to a jury that already believes itself deadlocked. Instructions given to a jury that has not yet begun to deliberate are less likely to weigh on a dissenting juror, or to be understood as a request that a particular dissenting juror abandon the view that is preventing an otherwise unanimous jury from reaching its verdict.").

[7] Whatever the trial court's motivation, we disagree with the dissent's assertion that it was reasonable for the trial court to conclude that "the jury had not engaged in an earnest and meaningful deliberative process that led to an intractable impasse." The jury had previously sent a note asking to see the gun, presumably because of the prosecution's contention that Williams's description of the weapon was inaccurate (and that his testimony was therefore not credible). Simply put, the record indicates that the jurors were following instructions and deliberating. To conclude otherwise on the basis of nothing more than the duration of deliberations would permit trial courts to fashion ad-hoc instructions based on nothing more than a hunch that one or more jurors may not be deliberating in good faith. Our opinion in *Sullivan*, which encourages courts to use the model deadlocked-jury instruction, is the better path.

10

coercive potential." See *People v Pollick*, 448 Mich 376, 385; 531 NW2d 159 (1995). Instead of simply instructing the jury to continue its deliberations after lunch, the trial court twice admonished the jury that "that's not the way this works," telegraphing that failure to reach a verdict was not an option.[8] Furthermore, without an indication that any juror refused to participate in deliberations or follow directions, the trial court twice asked the jurors to "let us know that," signaling to jurors that they should single out their fellow jurors. The trial court's veiled threats were the type of "undue pressure, threats, embarrassing assertions, or other wording that would tend to force a decision or cause a juror to abandon his conscientious dissent and defer to the majority." *Hardin*, 421 Mich at 321.[9]

---

[8] The dissent describes the trial court's ad-lib instruction as an "innocuous go-to-lunch instruction" because the trial court simply wanted to provide the jurors with "nourishment and an opportunity to clear their heads." This description ignores the problematic aspects of the court's instruction. We disagree with the dissent that "[n]o reasonable juror would interpret this statement as compelling a verdict by force or intimidation." First, the dissent distorts the standard by mistakenly asserting that "coercion" in this context is a term of ordinary usage as opposed to a term of art. No one alleges that the trial judge used force to coerce the verdict, and we have yet to find a case that defines "coercion" this way in this context. Second, we think a reasonable juror, having just informed the judge that the jury is deadlocked, might interpret the judge's rejoinder here in terms far more emphatic than a simple order to eat lunch.

[9] Unlike the dissent, we believe that the ad-lib instruction can be interpreted as an appeal to the jurors' "civic duty." See *Hardin*, 421 Mich at 316 (explaining that in *People v Goldsmith*, 411 Mich 555, 561; 309 NW2d 182 (1981), the Court held that "an instruction that calls for the jury, as part of its civic duty, to reach a unanimous verdict and which contains the message that the failure to reach a verdict constitutes a failure of purpose, is a substantial departure . . . because it tends to be coercive"). A reasonable juror may have interpreted the judge's comment to mean that failure to reach a verdict was not an option, i.e., that it was part of the jury's civic duty to reach a verdict.

11

Finally, given our review of the record, we are left with a firm conviction that the tenor set by the trial court contributed to the instruction being unduly coercive.[10] As noted in *Sullivan*, the coercive nature of the instruction must be evaluated in light of the factual context of the case. *Sullivan*, 392 Mich at 341. We agree with the dissenting Court of Appeals judge that this instruction was given in "a coercive and despotic atmosphere" that "likely persuaded dissenting jurors to abandon their principles." *Walker* (GLEICHER, J., dissenting), unpub op at 4.

After the trial court gave its ad-lib deadlocked-jury instruction and the jury returned from its lunch break, the jury returned a verdict in about 90 minutes. This quick turnaround in arriving at a guilty verdict after the trial court's supplemental instruction had been given suggests coercion. *Lowenfield*, 484 US at 238. Furthermore, earlier that day, the trial court had made clear to the jury that dissent would not be tolerated and that public humiliation would be the consequence for anyone who stepped out of line. When the trial court called the case, it noted that one of the jurors (Juror No. 8) was late and had not called in:

> All right, great. So we're getting a fifty-five minutes (sic) late start, and as you can see one of your jurors never came back. I don't wanna keep you all waiting and keep everybody involved in this case waiting any longer

---

[10] We disagree with the dissent that what it calls, "comments and methods by which a trial judge manages the trial," are irrelevant to an evaluation of "the factual context in which [the supplemental] instruction is given." *Hardin*, 421 Mich at 315. In fact, our analysis of whether the three challenged jury instructions in *Hardin* were unduly coercive opened with the statement that the issue "is better understood if we set forth, in some detail, the events that transpired" during deliberations, *id*. at 302-303, and closed with emphasis on "the tone and content of the trial court's language," *id*. at 320. *All* the trial court's comments during deliberations in *Hardin* were relevant in considering the factual context in which the challenged instructions were given. In this case, the trial court's conduct throughout the trial is part of the factual context in which the ad-lib instruction was given.

12

for someone who may or may not appear. And if that juror shows up then, you know, I don't know, bad things might happen to that person.

It's not fair for everyone involved to keep everyone waiting, and I do want to thank Juror No. 1, who knew she would be running a little late and she called.

Hopefully, this case will finish today, and you all won't have to worry about coming back tomorrow, but when you don't come on time it sets everybody back, it waste[s] everyone's time, so it's important that everyone be on time, okay. I'm talking to you guys, okay?

Juror No. 8 arrived during opening statements and was seated in the place reserved for in-custody criminal defendants—commonly referred to as the "prisoners' box"—during the completion of the prosecution's case. While we do not suggest that trial judges should not take steps to ensure that court proceedings begin in a timely fashion, we cannot discount the effect the trial court's ominous threat ("[B]ad things might happen to that person.") and its heavy-handed treatment of the recalcitrant juror may have had on the remaining jurors by situating that juror in the "prisoners' box" in view of the other jurors.[11]

We hold that, taken together, the omission of constructive guidance to the jury on how to deliberate, the omission of an honest-conviction reminder, the addition of coercive language suggesting that jurors single out other jurors for refusing to deliberate when there was no indication that a juror had refused to deliberate, and the trial court's conduct

---

[11] A better approach, of course, would be for the trial court to address the recalcitrant juror outside the presence of the other jurors and not situate that person in the "prisoners' box" in plain view of the other jurors. The record also shows that the trial court was distracted during the proceedings. For example, the trial court told trial counsel for both sides to "[h]old on, I think I'm about to get a new iPhone 6" when the attorneys asked to put a stipulation on the record. This inattention to the proceedings may have contributed to the trial court shifting blame to counsel for its own errors, such as when the trial court dismissively rebuffed defense counsel's attempts to remedy a mistake the court had made in restating a witness's testimony.

throughout the proceedings telegraphed that failing to reach a verdict would not be tolerated; thus, the instruction was unduly coercive. We emphasize that not every deviation from M Crim JI 3.12 will be erroneous, but the instruction given in this case omitted nearly every safeguard M Crim JI 3.12 contains; added an unwarranted invitation to single out dissenters; and was administered in a "coercive and despotic atmosphere," *Walker* (GLEICHER, J., dissenting), unpub op at 4. We hold that the ad-lib instruction affected defendant's substantial rights by affecting the jury's verdict. See *Carines*, 460 Mich at 763. We also conclude that that the error was clear and obvious. See *id*. Finally, in the greater context of the trial, the instruction seriously affected the fairness, integrity, and public reputation of the judicial proceedings by affecting the jury's verdict, and we therefore exercise our discretion to reverse defendant's conviction and remand this case to the Wayne Circuit Court for a new trial.

We also hold that because of the unprofessionalism and bias displayed by the trial court against defendant during sentencing, the case must be assigned to a different judge on remand.[12] When determining whether remand to a different judge is required, we examine the following factors:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of

---

[12] The dissent does not reach this issue, presumably given its conclusion on the instructional issue. We note, however, that the fairness of the trial court's sentence was raised by defendant as a basis for resentencing, independent of defendant's challenge to the deadlocked-jury instruction.

14

fairness.  [*People v Hill*, 221 Mich App 391, 398; 561 NW2d 862 (1997) (quotation marks and citations omitted).]

See also *People v Patton*, 497 Mich 959 (2015) (declining to reassign the case to a new judge on remand when the Court was not persuaded that the standards set forth in *Hill* had been met); *Sparks v Sparks*, 440 Mich 141, 163; 485 NW2d 893 (1992) (reassigning the case to a different judge on remand because the appearance of justice would be better served with a new judge presiding).

In this case, the trial court's behavior at defendant's sentencing hearing compels us to reassign this case to a new judge on remand.  After defendant indicated at least eight times during his allocution that he had nothing further to say, the trial judge continued to bait him, engaging in name-calling (calling him a "clown" six times and a "coward"), with the exchange escalating to defendant stating, "F--- you," to which the trial court replied, "Oh, you wish you could."  The trial court also admonished defendant, suggesting that he liked being in prison ("Cause that's what your life shows me, that you like to go to prison.") and stated that it would have sentenced him more leniently but for his disrespect toward the court ("I was inclined to give you the middle of the road, . . . but because you're so disrespectful and you just seem to want to go back to prison . . . .").

Upon even a cursory review of the sentencing transcript, it is clear to us that the court would have substantial difficulty setting aside its previously expressed views and that reassignment is necessary to preserve the appearance of justice given the hostility, bias, and incredulity directed against defendant by the court.[13]  Finally, any waste or duplication

---

[13] Although we do not rely on the sentencing transcript to support our holding regarding the coercive nature of the court's deadlocked-jury instruction, our review of the transcript gives us grave concern about the trial judge's demeanor and approach in her interactions

is not out of proportion to the gain in preserving the appearance of fairness. Defendant shall therefore be retried before a different judge.[14]

## IV. CONCLUSION

We reverse the judgment of the Court of Appeals and remand this case to the Wayne Circuit Court for a new trial in front of a different judge. Because we grant a new trial, we do not address the remaining issues raised by defendant.

Megan K. Cavanagh
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement

---

with this defendant. It is enough, at this point, to say that the trial judge's conduct was well outside the bounds of what we consider an appropriate way to conduct a sentencing hearing—even one involving a difficult person. Had this exchange or one like it occurred earlier in the trial, there is little doubt it would have called into question whether defendant was deprived of a fair trial. See *People v Stevens*, 498 Mich 162; 869 NW2d 233 (2015) (holding that because the trial judge's conduct pierced the veil of judicial impartiality, the defendant was deprived of a fair trial).

[14] The dissent challenges our trial court bona fides by lamenting our "disconnection from the realities of the trial-court process." Such an approach does little to illuminate the issues in this case and therefore does not warrant a response other than to note that if the choice is between an ivory tower where the Constitution still holds sway, or an alternative universe where this judge's performance during this trial and sentencing is deemed acceptable, we choose the former.

16

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                           No. 155198

HAROLD LAMONT WALKER,

      Defendant-Appellant.

_____

ZAHRA, J. (*dissenting*).

I respectfully dissent. In the morning, following a full day of testimony in a relatively simple case, the jury heard closing arguments, received its final instructions, and retired to deliberate. After an hour and fifteen minutes of deliberation, the jury indicated that it had reached an impasse. With no objection, the trial judge informed the jurors that she did not believe they were truly deadlocked after their brief period of deliberation. Rather than providing the standard instruction for deadlocked juries, the trial judge sent the jurors to lunch to afford them nourishment and an opportunity to clear their heads. After lunch, the jurors resumed deliberations and, after an additional hour and a half of deliberations, the jury delivered a guilty verdict. Because the innocuous go-to-lunch instruction was far from being coercive, I discern no basis for reversing the jury's verdict.

## I. PERTINENT FACTUAL BACKGROUND

Absent from the majority's opinion are the trial judge's instructions delivered to the jury following the conclusion of closing arguments, around one and a half hours before the jury announced it was at an impasse:

> A verdict in a criminal case must be unanimous. In order to return a verdict it is necessary that each of you agrees on that verdict. In the jury room you will discuss the case among yourselves, but ultimately each of you have to make up your own mind. Any verdict must represent the individual considered judgement of each [of] you.
>
> It is your duty as jurors to talk to each other and make every reasonable effort to reach agreement. Express your opinions and the reason for them, but keep an open mind as you listen to your [fellow] jurors. Rethink your opinions and do not hesitate to change your mind if you decide that you were wrong. Try your best to work out your differences.
>
> However, although you should try to reach an agreement, none of you should give up your honest opinion about the case just because other jurors disagree with you or just for the sake of reaching a verdict.
>
> In the end, your vote must be your own, and you must vote honestly and in good conscious [sic].

The record reveals that a written copy of these instructions was provided to the jury for reference during deliberations. The jury retired to deliberate at 11:19 a.m. Roughly an hour and fifteen minutes later (around 12:36 p.m.), it sent out a note that read, "We are hung, and I don't believe there will [be] an agreement with more time." The trial judge reconvened court, informed the parties that the jury had declared itself unable to reach a verdict, and stated her intent to instruct the jurors that they could not simply give up after an hour. Specifically, the trial judge stated as follows:

> I'll sent [sic] them to lunch, they'll be back at 1:35 and I'll send them back in there. That's it. And if they send another note, you know, they have to at least deliberate as long as it took [to] try the case, so. They'll come back

2

tomorrow, if they have to, but I'm not prepared to read them the deadlock instruction, because I don't believe that they've even attempted to deliberate at this point, so. That's it.

Now if there's—if I get another note that indicates that they are deadlocked then I'll read the Allen[1] Instruction, after lunch, but at this point after one hour of deliberations I don't think, you know, that they've even made a[n] effort. So, I'm gonna bring them out, I'm gonna tell them just that and I'm sending to lunch.

Is there anything else?

Without any objection, the trial judge instructed the bailiff to bring the jurors into the courtroom, and after reading their note into the record, she instructed them as follows:

Well, that's not the way this works. Your [sic] all heard a full day of testimony, and you deliberated for what a[n] hour and fifteen minutes, and now you just give up. That's not the way it works, I'm sending you all to lunch, maybe what you need is some time a part [sic] and some nourishment, other than candy, to help you all, you know, have clear heads and review the evidence that you heard.

Now, if there's someone among you who's failing to follow the instructions or there's someone who's refusing to participate in the process, you can send us a note and let us know that and we can address that, but at this point I'm not inclined to end your deliberations at this point because you had a full day of testimony and you've only been at this, discussing it, for one hour.

So, I'm going to send you to lunch, maybe sometime [sic] apart will help you all to think about things, and then you'll come back in one hour and resume your deliberations. If you have any questions, if there is anything that you don't understand or need clarification on send a note. And again, if there's one among you or two among you, three among you who are refusing to follow instructions or participate in the process you can let us know that, too.

Remember you are not to discuss this case, when you are anywhere other than in the jury room cause you're still a juror. So even if you go to

---

[1] *Allen v United States*, 164 US 492; 17 S Ct 154; 41 L Ed 528 (1896).

3

lunch together some of you, you can not [sic] discuss this case cause you can only discuss it when you're all together and when you're in the jury room.

The judge dismissed the jurors for lunch at 12:41 p.m., and they were expected to return around 1:40 p.m. About one and a half hours later, at 3:07 p.m., the jury returned with its verdict, finding defendant guilty as charged.

## II. LEGAL BACKGROUND

When a jury indicates that it is unable to reach a verdict, the trial court may give supplemental jury instructions and direct the jury to continue deliberations.[2] The textbook instruction in this context is known as an "*Allen* charge."[3] The *Allen* charge is also known as a "dynamite charge,"[4] a "nitroglycerin charge,"[5] or a "shotgun instruction"[6] because of

---

[2] See *People v Hardin*, 421 Mich 296, 316; 365 NW2d 101 (1984).

[3] *Allen*, 164 US 492.

[4] As the United States Court of Appeals for the Ninth Circuit explained in *United States v Berger*, 473 F3d 1080, 1089 (CA 9, 2007):

> "The term '*Allen* charge' is the generic name for a class of supplemental jury instructions given when jurors are apparently deadlocked; the name derives from the first Supreme Court approval of such an instruction in *Allen* . . . . In their mildest form, these instructions carry reminders of the importance of securing a verdict and ask jurors to reconsider potentially unreasonable positions. In their stronger forms, these charges have been referred to as 'dynamite charges,' because of their ability to 'blast' a verdict out of a deadlocked jury." [Quoting *United States v Mason*, 658 F2d 1263, 1265 n 1 (CA 9, 1981).]

[5] *Huffman v United States*, 297 F2d 754, 759 (CA 5, 1962) (Brown, J., concurring in part and dissenting in part).

[6] *State v Nelson*, 63 NM 428, 431; 321 P2d 202 (1958).

its ability to rapidly generate a verdict from an otherwise deadlocked jury.[7]

A proper supplemental instruction facilitates continued deliberation while avoiding coercion, but if the supplemental instruction would force a juror to surrender an honest conviction, the instruction is impermissibly coercive.[8] This Court has identified the two essential hallmarks of a proper deadlocked-jury charge: (1) encouragement of a respectful discussion in which the jurors consider all views and (2) respect for each individual juror's right to disagree. A judge should emphasize "that each juror has to make an individual judgment"[9] and that "no juror need surrender his honest convictions concerning the evidence solely for the purpose of obtaining a unanimous agreement."[10] "The optimum instruction will generate discussion directed towards the resolution of the case but will avoid forcing a decision."[11] Ultimately, an instruction "must be examined in the factual context in which it is given."[12]

This Court has identified various factors that guide the contextual analysis of whether a deadlocked-jury instruction is unduly coercive. The trial court's instruction must not contain "undue pressure, threats, embarrassing assertions, or other wording that would tend to force a decision or cause a juror to abandon his conscientious dissent and defer to

---

[7] *Berger*, 473 F3d at 1089.

[8] *People v Sullivan*, 392 Mich 324, 334; 220 NW2d 441 (1974).

[9] *Id*. at 337.

[10] *People v Goldsmith*, 411 Mich 555, 559; 309 NW2d 182 (1981).

[11] *Sullivan*, 392 Mich at 334.

[12] *Hardin*, 421 Mich at 315.

the majority."[13] Additional language will "rarely" be considered a substantial departure if it "contains 'no pressure, threats, embarrassing assertions, or other wording that would cause this Court to feel that it constituted coercion.' "[14]

The trial judge must also refrain from requiring or threatening to require "the jury to deliberate for an unreasonable length of time or for unreasonable intervals."[15] Additionally, the trial judge must not state or imply that the jury must reach a decision or else it has failed.[16] In fact, "an instruction that calls for the jury, as part of its civic duty, to reach a unanimous verdict and which contains the message that the failure to reach a verdict constitutes a failure of purpose, is a substantial departure . . . because it tends to be coercive."[17] For example, in *People v Goldsmith*,[18] this Court held that a jury instruction was unduly coercive because the trial judge stated, " 'A jury unable to agree, therefore, is a jury which has failed in its purpose.' "

The timing of the instruction is a relevant factor in determining whether the instruction was unduly coercive. That is, no special insight is needed "to see that there is greater coercive potential when an instruction is given to a jury that already believes itself

---

[13] *Id*. at 321.

[14] *Id*. at 315, quoting *People v Holmes*, 132 Mich App 730, 749; 349 NW2d 230 (1984).

[15] *Hardin*, 421 Mich at 318-319.

[16] See *Goldsmith*, 411 Mich at 561; *Lowenfield v Phelps*, 484 US 231, 239; 108 S Ct 546; 98 L Ed 2d 568 (1988), citing *Jenkins v United States*, 380 US 445, 446; 85 S Ct 1059; 13 L Ed 2d 957 (1965).

[17] *Hardin*, 421 Mich at 316.

[18] *Goldsmith*, 411 Mich at 558, 561.

6

deadlocked"[19] because, at that point, there exists a "minority faction" that is prone to coercion.[20]  But if a jury returns from its deliberations after a relatively brief period, the court would incontestably have the authority to insist that the jurors deliberate further.[21] Also, a quick turnaround of a guilty verdict after a supplemental instruction is given to the jury can be suggestive of coercion.[22]

### III.  DISCUSSION

### A.  THE SUPPLEMENTAL INSTRUCTION DIRECTING THE JURORS TO BREAK FOR LUNCH BEFORE CONTINUING DELIBERATIONS WAS NOT IMPROPER OR COERCIVE

The majority concludes that the supplemental instruction directing jurors to go to lunch before deliberating further was so unduly coercive that defendant was denied his constitutional right to a fair trial.  I disagree.

The majority's holding that the supplemental instruction "crossed the line" does not accurately reflect the traditional understanding of jury coercion.  The majority acknowledges that the judge's direction to the jurors to "continue your deliberations" might have been a permissible supplemental instruction[23] but then cites two specific statements by the trial judge that the majority concludes were coercive: (1) stating, "[T]hat's not the way this works" and (2) twice asking the jurors to "let us know" if one or more jurors were

---

[19] *People v Pollick*, 448 Mich 376, 385; 531 NW2d 159 (1995).

[20] *Goldsmith*, 411 Mich at 560 (quotation marks omitted).

[21] *Lowenfield*, 484 US at 238.

[22] *Id*. at 240.

[23] *Ante* at 8; see *People v France*, 436 Mich 138, 165-166; 461 NW2d 621 (1990).

7

refusing to participate or to follow the instructions even though there was no indication that any juror had refused to participate in the deliberations or to follow the court's instructions. The finding of coerciveness from these two phrases is extremely problematic because it ignores the practical reality the trial judge faced in this situation.[24]

Contrary to the majority's assertion, there was a complete absence of coercive language in the trial judge's supplemental instruction. Coercion is commonly understood as the process of restraining or compelling by force or intimidation.[25] In the majority's view, the trial judge implied that a failure to reach a verdict would not be tolerated when it told the jury, "Well, that's not the way this works." The pertinent portions of the transcript suggest that the trial judge was referring to the jury's failure to *engage* in full-fledged deliberation, not its failure to *reach a verdict*. Notably, the judge continued this statement as follows:

> You[] all heard a full day of testimony, and you deliberated for what a[n] hour and fifteen minutes, and now you just give up. That's not the way it works, I'm sending you all to lunch, maybe what you need is some time a

---

[24] The trial judge is uniquely situated to size up a jury to determine whether jurors are merely in need of a respite or truly at a point of impasse. When a trial judge has reason to believe that a jury has not earnestly and interactively participated in the deliberative process, it would be imprudent and unwise to read an *Allen* charge, which, although sanctioned by this Court and the Supreme Court of the United States, nonetheless features coercive attributes. In this case, the trial judge reasonably concluded the jury had not engaged in an earnest and meaningful deliberative process that led to an intractable impasse. The decision to send them to lunch before having them deliberate again was not only not erroneous but prudent under the circumstances.

[25] See *Merriam Webster's Collegiate Dictionary* (11th ed); *Random House Webster's College Dictionary* (1997). While the majority criticizes the ordinary usage of this term, as opposed to using "coercion" as a term of art, it offers no alternative definition of "coercion" to suggest it means anything other than the basic concept of compelling action by force *or* intimidation.

8

part [sic] and some nourishment, other than candy, to help you all, you know, have clear heads and review the evidence that you heard.

Taken in context, a rational and reasonable interpretation of the statement suggests that the phrase "that's not the way this works" was in no way coercive. The trial judge followed these words with the conclusion that a lunch break was needed to provide the jurors with "nourishment" and "some time a part" to help them "have clear heads and review the evidence" after they returned to court. No reasonable juror would interpret this statement as compelling a verdict by force or intimidation. To the contrary, the trial judge merely afforded the jurors a lunch break to help the jurors engage in the deliberative process when they returned.

Similarly, the trial judge's direction that the jury should let the court know "if there's someone among you who's *failing to follow the instructions* or there's someone who's *refusing to participate in the process*" was not coercive.[26] To the contrary, this instruction was sensible. The trial judge expressed the view that the jurors had not engaged in meaningful deliberation and implied that additional effort by the jury was needed before an impasse could be declared. Nonetheless, additional deliberation would not be fruitful, and would in fact be counterproductive, if one or more jurors failed to follow the closing instruction that jurors "talk to each other and make every reasonable effort to reach agreement." The trial judge merely informed the jury that additional deliberation was necessary and that the judge should be alerted if there was a breakdown in the process.

Notably, the trial judge did not single out dissenting jurors—rather, she instructed that further deliberations were not required if there were jurors who refused to engage in

---

[26] Emphasis added.

9

the deliberative process. I strongly disagree with the majority's view that these statements amounted to "undue pressure, threats, [or] embarrassing assertions . . . that would tend to force a decision or cause a juror to abandon his conscientious dissent and defer to the majority."[27] To the contrary, these statements properly reflect the notion that refusal to follow the final instructions or engage in the deliberative process required by law is unacceptable.

It is also significant that the trial judge did not appeal to "civic duty" or assert that "failure to reach a verdict constitutes a failure of purpose."[28] While the majority believes that a reasonable juror may have interpreted the judge's comments to mean "that it was part of the jury's civic duty to reach a verdict,"[29] the trial judge's instruction simply focused on the jury's short period of deliberation and the need for nutrition and time apart before further deliberation. Given the majority's logic, a "reasonable juror" could interpret almost any judicial instruction as an appeal to his or her civic duty. Thus, the absence of any actual language appealing to the jury's civic duty is significant. In all practical reality, the supplemental instruction facilitated effective deliberation by ensuring that the jurors could resume deliberations with "clear heads" after eating something nutritious. The only requirement the trial judge imposed on the jurors was to go to lunch. In so doing, she in no way coerced one or more jurors to vote to convict.

---

[27] *Hardin*, 421 Mich at 321; see *Goldsmith*, 411 Mich at 558-561.

[28] *Hardin*, 421 Mich at 316.

[29] *Ante* at 11 n 9.

The majority also fails to give adequate consideration to the trial judge's unique relationship to these proceedings. That is, the jury indicated it was deadlocked after merely an hour and fifteen minutes of deliberation; thus, the trial judge, in her unique position, appeared to have a reasonable basis upon which to disbelieve that the jurors were genuinely deadlocked. The trial judge's comments therefore reflect a reasonable degree of skepticism that the jury had given a real effort at deliberating.[30]

The overall effect of the instruction was not to coerce the jury but "to stress the need to engage in full-fledged deliberation."[31] That is, the "comments were directed toward generating discussion and fostering resolution of the case . . . ."[32] And while the trial judge did not remind the jurors that they should maintain their honest convictions after the jury suggested it might be at an impasse, this omission is not dispositive of whether the supplemental instruction was, taken in context, coercive. As eloquently stated by the majority, an "honest-conviction reminder . . . tempers the court's simultaneous emphasis on reaching a unanimous agreement."[33] In this case, nothing in the trial judge's instruction emphasized that the jurors should reach agreement on a verdict. To the contrary, the trial judge merely emphasized that the jurors had not deliberated a sufficient amount of time.

---

[30] See *Lowenfield*, 484 US at 238 ("Surely if the jury had returned from its deliberations after only one hour and informed the court that it had failed to achieve unanimity . . . , the court would incontestably have had the authority to insist that they deliberate further.").

[31] *Hardin*, 421 Mich at 321.

[32] *Id.* at 320.

[33] *Ante* at 9.

11

This is a critical distinction that emphasizes why the "honestly held beliefs" reminder was not necessary and is therefore not dispositive.

It is also significant that the jury had a written copy of the court's final instructions in the jury room. Those instructions, which were given less than 90 minutes before the jury announced that it was deadlocked, stressed in various ways the notion that the jurors are not to give up their "honest belief" during deliberations:

> In the jury room you will discuss the case among yourselves, but ultimately, *each of you have to make up your own mind. . . .*
>
> \* \* \*
>
> . . . Rethink your opinions and do not hesitate to change your mind if you decide that you were wrong. . . .
>
> \* \* \*
>
> However, although you should try to reach an agreement, *none of you should give up your honest opinion* about the case just because other jurors disagree with you or just for the sake of reaching a verdict.
>
> In the end, *your vote must be your own, and you must vote honestly and in good conscious* [sic]. [Emphasis added.]

Therefore, the trial judge's failure to once again encourage jurors to maintain their own convictions did not transform the supplemental instruction to deliberate after returning from lunch into an unduly coercive one.

In support of its conclusion that the failure to instruct jurors to maintain their "honest beliefs" was a fatal omission, the majority relies on *People v Engle*.[34] This Court ordered a new trial in that case because the jury was not instructed that its verdict had to be the

---

[34] *People v Engle*, 118 Mich 287, 291-292; 76 NW 502 (1898).

product of each juror's individual convictions.[35]  The majority's reliance on *Engle* is misguided.  Significantly, the opinion in *Engle* does not disclose how long the jury deliberated before declaring they had reached an impasse.  Further, the Court's opinion in *Engle* suggests that the jury was never instructed that each juror should maintain his or her own convictions.  This is a significant and critical distinction.  But even assuming the *Engle* jury did receive such an instruction before beginning deliberations, another meaningful distinction remains: the *Engle* jury was instructed that each juror "must . . . try to be persuaded."[36]  Such an instruction tends to force a verdict because it may compel dissenting jurors to give in to their colleagues' positions over their own.  No instruction or utterance from the trial judge in the instant case compares to the coercive charge given by the trial judge in *Engle*.

The majority further faults the trial judge for failing to provide the jurors guidance on how to continue deliberating and how to try to break through the impasse, but these omissions are also not dispositive.  Again, the trial judge reasonably disbelieved that the jury had put forth a genuine effort in the deliberative process such that they were truly deadlocked in the first place.  Had the trial judge concluded that the jury was actually deadlocked after their brief deliberation, it would have been necessary for her to guide the jurors on how to break through the impasse and to instruct the jury in accordance with the other hallmark features of an *Allen* charge.  But as a threshold matter, this trial judge had rejected the idea that the jury was deadlocked at that point in their deliberations.  And the

---

[35] *Id*.

[36] *Id*. at 291.

judge's remarks clearly indicate that if the jury had again expressed it was deadlocked after further deliberation, the judge would have given the *Allen* instruction. In my view, the trial judge acted prudently under the circumstances.

It is also troubling that the Court's holding promotes a per se rule that any departure from M Crim JI 3.12 necessarily results in an unduly coercive instruction. This is inconsistent with this Court's mandate that each instruction must be examined in its factual context and that only "substantial departures" from the model instruction constitute error requiring reversal.[37] In this sense, the majority focuses too closely on immaterial omissions from the model instruction. The inquiry is whether the court's supplemental instruction was coercive,[38] not simply to what extent it fails to reflect M Crim JI 3.12. Accordingly, the omissions the majority identifies are not material, and they are, therefore, not dispositive.

The majority relies on portions of the lower court record that are wholly unrelated to whether the supplemental instruction itself was coercive to support its conclusion that the trial judge's response to the jury's note conveyed a coercive message to the jury. This is no small matter. Never before has this Court determined that judicial actions unrelated to instructing the jury may render an otherwise innocuous instruction coercive. While it is true that the instruction must be evaluated in light of the factual context of the case,[39] this context relates to the factual dispute presented to the jury, not the comments and methods

---

[37] *Hardin*, 421 Mich at 313, 315.

[38] *Id*. at 314; *Sullivan*, 392 Mich at 334.

[39] *Sullivan*, 392 Mich at 334.

by which a trial judge manages the trial. Of greater import, the portions of the record the majority cites do not support its conclusion that the supplemental instruction was coercive.

The majority accepts the dissenting Court of Appeals judge's view that the context in which the supplemental instruction was given was "a coercive and despotic atmosphere" that "likely persuaded dissenting jurors to abandon their principles."[40] The majority cites three instances of the trial judge's conduct to suggest that "dissent would not be tolerated" and that jurors who misbehaved would be punished with "public humiliation." These three instances of conduct are: (1) her rebuke of an alternate juror who, without notice, arrived more than an hour late for trial; (2) her reference to receiving a new smart phone during the trial proceedings; and (3) her disagreement with defense counsel over a minor point regarding the testimony of one witness. None of this conduct, taken individually or collectively, supports the notion that the jury was coerced into convicting defendant. The majority's analysis of this behavior, and the weight afforded to it in the majority's analysis, establishes that the majority has improvidently concluded that the supplemental instruction coerced the jury into delivering a verdict.

There is nothing autocratic, intimidating, or tyrannical in regard to the portion of the proceedings during which the judge was distracted and unable to accept a stipulation between counsel because she was "about to get a new iPhone 6." This exchange evinces, at its absolute worst, a momentary lapse of professionalism. But the exchange does not contribute a scintilla of evidence toward a finding of a "despotic" or "coercive" courtroom

---

[40] *People v Walker*, unpublished per curiam opinion of the Court of Appeals, issued December 1, 2016 (Docket No. 327063) (GLEICHER, J., dissenting), p 4.

15

environment. The same conclusion applies to the trial judge's disagreement with defense counsel regarding the substance of Sergeant Matthew Gnatek's testimony.[41] The trial judge incorrectly concluded that defense counsel mischaracterized the officer's prior testimony, but this error is wholly immaterial. More significantly, in making her ruling, the trial judge was not disrespectful, domineering, or imperious toward defense counsel. She simply stated she would not argue the point because she had made her ruling. Nothing in this exchange suggests that the instruction was coercive, as found by the majority. Having dismissed these two examples of the coercive nature of the proceedings, the majority is thus left to hang its claims of "despotism" and "coercion" on the events involving Juror No. 8.

We are indeed ruling from an unusually lofty ivory tower wherefrom we second-guess trial judges who rebuke—even harshly so—jurors who woefully fail to conform to the requirements of the court. This Court's disconnection from the realities of the trial-court process becomes even more troublesome when we conclude, as the majority does here, that such conduct is evidence that the entirety of the trial was "despotic" and "coercive." Chastising a juror who is more than an hour late for trial without even extending the court the courtesy of calling to explain why that juror cannot timely appear is within the range of acceptable trial-court conduct. Because the judge's response was

---

[41] On direct examination Sergeant Gnatek testified he had observed defendant sprinting away from the group with whom he was gathered. On cross-examination, defense counsel asked Sergeant Gnatek to reaffirm that he had observed defendant sprinting away. The trial judge described this as a mischaracterization of Sergeant Gnatek's prior testimony. The judge believed that the officer had testified that defendant had run rather than sprinted away from the group.

16

appropriate, it is not evidence of the coercive nature of a jury instruction given a day after Juror No. 8 was rebuked and discharged for being tardy. The trial judge merely displayed her interest in running a timely and efficient, no-nonsense courtroom. This action cannot be translated into a signal from the judge to the jurors that they are to act in accordance with her implicit views of the case.

With the benefit of hindsight, the majority describes "[a] better approach" to handle punctually challenged jurors. Regardless of whether the approach described by the majority is "better," this Court should not be in the business of second-guessing the manner by which trial courts handle discourteous jurors who fail to timely appear for service as ordered by the court. Such jurors are not only disrespectful of their fellow jurors and the court, they also delay our justice system to the detriment of taxpayers and litigants not only in the case in which they are serving but also in all other cases on the trial court's backlogged docket. While each trial judge may choose to handle such occurrences differently, the action taken by any given judge rests in the inherent discretion invested in each judge to manage the courtroom. And even if the remaining jurors perceived the act of requiring tardy Juror No. 8 to sit in an area of the courtroom normally reserved for remanded litigants as an act of public humiliation, jurors are fully competent to understand that even a harsh, but deserved, rebuke to a tardy juror is hardly a directive to the remaining jurors that they are therefore to ignore the instructions on the law and, instead, subordinate their decision-making authority concerning matters of guilt or innocence to the implicit preferences of the trial judge.

In sum, viewing the supplemental instruction in proper context, I conclude that the only "coercive" act by the trial judge was requiring the jury to go to lunch before resuming

17

its deliberations. Nothing in the record supports the conclusion that the trial judge implicitly directed the jurors to return a guilty verdict.

## B. DEFENDANT HAS NOT SHOWN THAT THE SUPPLEMENTAL INSTRUCTION SERIOUSLY AFFECTED THE FAIRNESS, INTEGRITY, AND PUBLIC REPUTATION OF THE JUDICIAL PROCEEDINGS

Even if we were to concede that the trial judge erred by giving the supplemental instruction, reversal of defendant's conviction is not warranted because he has failed to satisfy the plain-error standard of review.[42] This standard requires a defendant to establish that (1) error occurred, (2) the error was plain (i.e., "clear or obvious"), and (3) the error affected the defendant's substantial rights.[43] But even if the defendant satisfies these three elements, reversal is warranted *only* when the error results in either the conviction of an actually innocent defendant or seriously affects the fairness, integrity, or public reputation of judicial proceedings independent of the defendant's innocence.[44]

The majority's application of the fourth plain-error prong is deeply concerning: it summarily concludes that the supplemental instruction "seriously affected the fairness, integrity, and public reputation of the judicial proceedings by affecting the jury's verdict[.]" Simply put, the majority unduly strains the plain-error standard. Even assuming that the trial judge, in giving the supplemental instruction, committed a clear or obvious

---

[42] *People v Aldrich*, 246 Mich App 101, 124-125; 631 NW2d 67 (2001) (explaining that unpreserved claims of instructional error are reviewed for plain error affecting the defendant's substantial rights, while the instructions themselves are reviewed in their entirety).

[43] *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999), citing *United States v Olano*, 507 US 725, 731; 113 S Ct 1770; 123 L Ed 2d 508 (1993).

[44] *Carines*, 460 Mich at 763.

error of law that affected defendant's substantial rights, there is no basis for reversal under the fourth requirement of the plain-error standard.

Neither the fairness nor the integrity nor the public reputation of this trial was compromised when the trial judge gave the supplemental instruction that the jury should go to lunch and continue deliberating upon return. The trial judge made it clear from the outset that she did not believe the jury was indeed deadlocked. She informed the attorneys that the jury could not deliberate for 75 minutes and simply give up. She informed counsel of her intent to tell the jurors exactly that. Next, she informed counsel that if it turned out that one or more jurors was not participating in the jury process, the court would address that situation. Then, she stated that she was going to send the jurors to lunch. She also expressed that she would give the *Allen* instruction if she received another "deadlocked" note after lunch. Finally, she again reminded the attorneys that she would make these statements to the jury and then asked if there was anything else to address.

In providing this explanation, the trial judge essentially provided counsel multiple opportunities to object and on several grounds. That is, she specifically afforded the opportunity to object based on the general omission of the *Allen* charge, the supposedly coercive statements made to the jury, and on the grounds that she was sending the jurors to lunch at that time. But no objection was asserted. Without any objection to aid or inform the trial judge about the substance of defendant's concerns, the judge brought the jury into the courtroom and instructed them as she had informed counsel she would. And while the absence of an objection does not categorically preclude a defendant from establishing plain error, the absence of objections in this context suggests that any error was certainly not clear or obvious, considering defense counsel was presented with *several grounds* upon

19

which to object and was provided a *detailed explanation* as to what the court was going to tell the jury. But for the same reasons, even assuming defense counsel missed a clear or obvious error of law, the trial judge did not come close to compromising the fairness, integrity, or public reputation of the trial. On these facts, the plain-error standard is not even close to being satisfied.

## IV. CONCLUSION

This Court's holding misapprehends the traditional understanding of juror coercion, fails to recognize the practical realities of trial-court proceedings, and strains the requirements for reversing a jury's verdict under the plain-error standard of review. At most, the trial judge merely required the jury to go to lunch. Nothing said by the trial judge coerced the jury to convict defendant. Accordingly, I would affirm the judgment of the Court of Appeals.

Brian K. Zahra
Stephen J. Markman